The first case is 20-21-25, Redeemed Christian Church of God, Bowie, Maryland v. Prince George's Mr. Wray. Thank you, Judge King. Good afternoon, your honors, and may it please the court. Good to have you with us, sir. Thank you. The principal question presented in this appeal is whether or not a legislative amendment to a county water and sewer plan constitutes a land use regulation subject to the religious use and institutionalized persons statute. In this case, Appelli purchased four parcels of land in order to build and develop a 60,000 square foot church with impervious parking surfaces to accommodate a minimum of 750 vehicles for the parking lot. The property that was purchased was in a Category 5 under the county water and sewer plan, which is reserved for future low density residential development. It's basically well accepted. In order to proceed with the development, the applicant here, the church, had to apply for a legislative amendment to the water and sewer plan under Section 6.3 of that plan in order to upgrade the property to Category 4 and obtain public water and sewer. The process by which that amendment is decided is a legislative process. It is subject to criteria set forth in Section 2.1.4 of the plan. It is decided during one of three legislative sessions by a vote of the county council after public hearings and comment. Among the criteria that the county council is mandated by both the Maryland state law and the plan to consider are traffic, safety, and infrastructure in the community that surrounds this property and the burden on the local taxpayers. The county followed... And how can they, how can the traffic issues be considered when appellant didn't provide any evidence of traffic issues or any traffic study? Appellant, they can be considered and the plan at the county council level does not require a traffic study of any kind. And the evidence that was presented was by 21 witnesses at the public hearing. And that's the evidence that you presented to the district court as well? That's the only evidence? That is correct. In addition to photographs that accompanied the testimony, which were not presented at the county council, but were admitted into evidence. Did you call the people at the trial or did you just put in the evidence or testimony when they showed up for the meeting? Well, we called four individuals who testified before both the Bowie City Council and the County Council at trial. And we admitted the entire record of the application and the public testimony below. It seems to me that Judge Chastno gave you a really good shot at it by giving you a three-day trial to prove your contentions. And she knows what she's doing. I have not been interested. And you had full discovery, right? You had all kinds of discovery. We did. Y'all worked this case pretty strong and got a three-day trial. We did. I guess that makes her opinion is sort of like a specific verdict that normally don't get from a finder of fact. She wrote it all up, findings of fact and conclusions of law. That puts you in a position to have an uphill battle. She did have findings of fact and conclusions of law. I would respectfully suggest that the fundamental question was answered incorrectly by the trial court. And that is whether or not this amendment constitutes a land-use regulation or the application of a land-use regulation. Council, before you go to that, going back to Judge Thacker's question, you mentioned the 21 people. Can you tell me what you believe the best evidence that you put forward to meet your burden, that this particular church would negatively impact the traffic? Who am I looking? I mean, I understand you're saying they're 21, but we're not general. I'm not looking for general traffic problems. But who had the knowledge and expertise to be able to say that the addition of this church would negatively impact traffic? Yes, I believe the individuals who testified had that knowledge and ability. And the evidence that was put forward was, one, this development was going to accommodate a minimum of 750 vehicles at discrete points in time, going in and going out from events and church services. Two, the roads at issue are old and in disrepair. And we presented evidence of significant accidents on those roads adjacent to the property, at least a dozen of them, all of which resulted in personal injuries, many of which resulted in helicopters having to medevac people out. Those were also submitted in the photographs. We also... I'm sorry, but I think, and certainly Judge Richardson can correct me if I'm wrong, but I think he, Judge Richardson was asking, which of those 21, and maybe there's more than one witness, do you think provides the strongest evidence in support of your argument? If that's what you're asking, I would say that Ms. Sims is one. The woman who escapes my memory right now and testified about the events on Sundays is the second one. She talked about sporting events and the families that go there right next to this property. So speaking of the sporting events, why aren't the sporting events the problem? With all these kids going back and forth across what is allegedly a dangerous highway, why would the church be the problem? It's not even there yet. How would denying the church ameliorate the traffic problems that are already there? Sounds like these kids running around at the soccer games might be more of a challenge. And they very well may be, but the question is not whether or not the church caused this problem. The question is whether or not it will exacerbate it. And how do we know whether it will exacerbate the problem? Does Ms. Sims, is she an expert of some sort? No. And we could not do a traffic study. With this trial, the entire trial and all discovery was expedited at plaintiff's request. Our side consented to that. And it occurred. You could have gone somewhere and hired an expert on the traffic and got him to explain why you couldn't widen the road or put up traffic lights and things of that nature. That's the way traffic's usually controlled. We could have done that, yes. If you've got too much traffic, you do something to handle it. I mean, do you all, does the county council, that's what you represent? Yes, we're the county department. Does it have the responsibility for handling the traffic problems when they occur? It has a responsibility for addressing traffic problems. Well, and they've got an office that happens to deal with that kind of stuff. You could have called those witnesses to explain why they couldn't do anything to accommodate the church, the building church there, a little bit more traffic on Sunday. It is possible, but that also was not our burden, Your Honor. And if what you're alluding to is that there are other less restrictive means, that was never presented by the plaintiff or the applicant. And it is their burden to establish that there are less restrictive means. And the county- Yes, counsel, can I go back to the question that I asked? I see you, Ms. Sims and the events on Sundays, as I understand their testimony, and I'm sure you're more familiar with it than I am, they talk about how bad the traffic situation is today and has been for some time, right? But neither of them have lay or expert knowledge about what impact a church would have on traffic. Neither of them have expert knowledge. Or lay knowledge. I mean, do any of them have any experience with the impact of a church or other facility on traffic patterns? They, two of them did testify that we travel these, in answer to your question, no. If the specific question is, did they have lay knowledge of the impact of a new development in this area? No, but they did. So that, but that's what I'm trying to get at, right? So I guess what you're telling me is that your position is that you can meet your burden merely by having individuals say, traffic is back, full stop. So as long as you can say traffic is bad, then the judge below was required to conclude that it must, by necessity, going to get worse for reasons that you didn't put in the evidence. Is that, I mean, I'm not sure I'm even following your argument, to be frank. That is not my argument, Your Honor. My argument is that the individuals here understood the traffic, understood, and common sense allows them under the law to understand what the effect of 750 more cars in discrete timeframes will have on that traffic. That does not require expert testimony under the law. And one can draw a very reasonable inference based on that testimony that introducing that many vehicles into this confined area at confined times would exacerbate the problem. That is our argument. I just want, but that's it. You don't have, there's no, you don't have evidence to that effect. Your point, as I take it, is that we need to assume that as common sense, that a posture, it must be that the traffic safety problems, there'll be greater numbers of racks and all these conclusions you want us to draw comes from the existence of the facility with nothing more. The, not the existence of the facility, and it wouldn't matter what the facility is, whether it's commercial, retail, or church. That's the issue of the LUPA, is it's discriminatory towards a church. It's the issue of introducing 750 to 1,000 additional vehicles to an already dangerous situation. I think it is a reasonable inference, and the law says that when you have situations of traffic, you can draw that reasonable inference that it would be exacerbated. Has the county ever conducted a traffic study before in this area? It did not. Before this? Oh, before, there's nothing in the record that indicates they did before the trial. And, or ever even considered conducting a traffic study in this area before this church issue? I do know, actually, I know that there was an assessment of the roads done. I don't know if that included a traffic study. It was not among the records. Who did this assessment? The county? The county did for, for appropriations to do $10 million in improvements to widen the roads and put shoulders on them to make them safer. And that was before this. And was that done? No, they don't yet have the funding for it. That was one of the, one of the stakeholder issues that the county council addressed in saying that the applicant could reapply. I would also just... I'm sorry. Is that an evidence? You put all that in evidence? It is an evidence, your honor. Okay. And you could have asked for a jury trial here too, could you? Y'all had a bench trial. Of course. Yes, we could have. That's right. You waived your right to a bench trial and the judge found it against you. On page, I noticed on her opinion, page 21 of her opinion, she even said, and I quote her, this is not a close call, unquote. I understand. On the evidentiary issues, that was her opinion. What makes it look like she didn't think much of your case, my friend? I... You were... Take that back. All right. I respect your opinion, your honor, in that respect. If I could, just a few final points, because my time is running short. I don't believe that RLUIPA applied to this decision at all in the first instance, because RLUIPA requires an individualized assessment of the proposed use. There was no individualized assessment of the proposed use in this case. It had nothing to do... Water and sewer plan and the amendment to that plan is completely indifferent as to the use. If it does not entail an individualized assessment of the proposed use, it is not governed by RLUIPA. And that purpose... If this case isn't governed by RLUIPA, are you challenging our jurisdiction to hear it at all? I think it is a subject matter jurisdiction issue. And I did mention that in my brief, that there is not jurisdiction. It's not... And you say state law applies and not federal law, right? I do. And the reason I do... And you presented that to Judge Chasbon, and she shot that down, too. She shot all of our arguments down, correct, your honor. I mean, you have a jurisdictional claim that you preserved, but Judge Chasbon rejected it. She said the federal statute is governed by federal law. And if she's wrong on that, then you'd be perhaps entitled to some relief here. But she ruled against it on that, and then ruled against it on the rest. And I'd like to answer your question, but I am cutting into my rebuttal time. Is it all right, your honor? You go right ahead. Yes, sir. Go ahead. Thank you. While the court below focused on the individualized assessment and said that this was an individualized assessment, there was very little analysis, in her opinion, about the second component of that phrase, which is necessary, of a proposed use. There is nothing in this record that shows that the use of this facility as a religious organization versus a commercial versus a residential versus anything was at all the basis of the decision. In the first instance, RLUPA does not apply unless it is a land use regulation or application of that regulation, whereby you make an individualized assessment of the proposed use. That's zoning. Zoning discusses the proposed uses. This is not a zoning, and the structure of the statute supports this. The Maryland Environmental Article, Title IX, mandates the creation and amendments of water and sewer plans. The Maryland Land Use Article mandates Montgomery County and Prince George's County, in Title 27, to enact zoning regulations.  While there may be protection issues or some other issues, an amendment that is legislated to a water and sewer plan is not. The plan is in the record and the testimony. You can read the plan. Nowhere in there is the use, and nowhere in the record of the county council's decision is the use of the property as a religious organization the issue. And that's the fundamental purpose of RLUPA as an arrow from RFRA. I will reserve my last two and a half minutes. Thank you, Your Honors. Thank you, Mr. Ray. Ms. Casey, you're out there. Yes. Good afternoon, Your Honors, and may it please the court. Despite Prince George's County's arguments to the contrary, RLUPA plainly applies to the county's decision to deny Victory Temple's water-sewer category change. In fact, this case presents exactly the circumstances that RLUPA was adopted to protect against. Specifically, Victory Temple, a minority religious denomination, sought to build a church large enough to accommodate its growing congregation. Victory Temple complied with all applicable land use regulations, and Prince George's County's subject matter experts all agreed that the church should proceed with its development plans. However, after hearing from dissatisfied community members who expressed opposition towards the church, the county stopped Victory Temple's development in its tracks, citing a plethora of vague reasons on the record, like traffic impacts, environmental impacts, potential pollution, and inconsistency with the area master plan. For purposes of this litigation, the county has winnowed that plethora of reasons to one, traffic safety. After a three-day bench trial, Judge Chazan out- Traffic safety is listed as one of the criteria to be considered for evaluation in the water and sewer plan, isn't it? And how is that not at least an appropriate consideration? Your Honor, it's not that traffic safety is an inappropriate consideration. The issue is whether, at this stage, traffic safety represents the- the county's decision to- based on traffic safety is the least restrictive means of furthering a compelling governmental interest. So it's not that traffic safety can't be considered, it's whether solely basing the decision on traffic safety can satisfy strict scrutiny. And Judge Chazan now found that the county couldn't in this case. And that finding is entitled to- to deference. It's reviewed on a clear error standard. In fact, Judge Chazan now didn't simply find that the county failed to meet strict scrutiny. She found they wholly failed to meet strict scrutiny. That the- the basis of the decision in traffic safety was untethered to the decision to deny the water sewer category upgrade. So the county first argues- And I- I take his argument, maybe not fairly, but to be- because it has to be an individualized assessment of a proposed use, that the statute only applies if the stated reason for a county's denial is like the type of building and not the extension of a government service like- like sewer. Respond to that argument for us. Certainly, Your Honor. First, I think it's important to look at the text of RLUPA itself, which says that the statute applies when- when a county or local government implements a land use regulation or system of land use regulations that permit the government to make, or when the government does make, individualized assessments of the proposed uses for the property involved. Before I talk about no specific language, Your Honor, I want to mention that the- that Congress has directed- has inserted a specific canon of construction into the statute that requires courts to- I know they mean it, but what I'm- what I'm trying to- to get at is- I take your colleague's argument to say that's limited to uses of land, not the provision of government services, right? And so the sewer is the provision of government service, not the use of the land. If they denied it on the grounds that it's a church, all right, the statute applies because that's the use of the land. If they deny it based on the type of government service that they're going to provide, then I take his argument to be that doesn't- that's not a land use regulation, that's a government service extension. And so the statute simply doesn't apply. Your Honor, perhaps that- that may be true if that's all the water and sewer plan did, but it doesn't in this case. The water and sewer plan permits the county, in fact, directs the county to consider a whole range of development and site-specific criteria that are, in fact, related to zoning issues. Things like, for example, whether the proposal will affect environmental quality, what the traffic impacts might be, and other various things. And so in this case, the county did make an assessment, individualized assessment based on the proposed use of the property. Whether it was assessing based on its use as a church is insignificant for this- for this evaluation. It's the fact that the county assessed that the property was going to be used to build a 60,000 square foot structure with parking spaces for up to 750 vehicles. In fact, Chair Todd Turner, when he- in the- in his remarks at the April 23rd, 2019, TIEE meeting, explained his reasons for moving to deny Victory Temple's application. That's specifically what he referred to. He referred to testimony from public citizens about the size of the building, about the size of the parking lot. I just want to go back to his point. I just want to make sure I understand your argument here. Because I take his argument to be- is that the county did not deny the temple any use. All it said was, we're not going to provide this government service to you. So if you want to build- if you come back and say, I want to build a 60,000 square foot temple with all these parking spaces, but I'm going to use septic system and I'm going to drill a well, so I need neither water nor sewer. I take his position to be that that- that is a government service issue and not a land use issue that they've denied you on. They've denied the government service, not that they've denied your land use. And I'm just- I'm not sure I fully understand what your response to that is. Yes, Your Honor. Let me try to explain. The water sewer plan- in making a decision under the water sewer plan to deny a reclassification of the property from Category 5, future community service, to Category 4, that does more than just deny the property owner access to public water and sewer service. In fact, it's a barrier to further development of the property. And the record makes that clear. In fact, it's very clear in the record, the water sewer plan itself states explicitly that a property cannot move forward in the development review process while it is in Category 5. And to Your Honor's question about septic, there's never been any- any position advanced by the county that the church could move forward and build on septic. And there's evidence in the record, testimony from Barry Kaysan, who was an engineer at Ben Dyer, which conducted the feasibility study that the church had done in this case, that if a property owner wants to build a property greater than 5,000 square feet, it must move to Category 4. And there's no way, Your Honor, that a property- a structure less than 5,000 square feet could accommodate Victory Temple. Victory Temple was looking to build a church of 1,200 to 2,000 seats. Its current church is 521 seats, and it has 2,000 members. So, 5,000 square feet is not an option. It needs to move to Category 4 to be able to build a bigger structure, and that's what the county prevented it from doing. Do you agree if the- if the situation was different? I understand this is a hypothetical, but if the county said, instead of what happened here, we'll move you to any category you want to be in, but we refuse to provide you water and sewer. So, you can do anything you want to on your land, but you will never get water and sewer from us. Would that fall within the statute? Yes, Your Honor, because it would be a substantial burden. It would be a substantial burden on Victory Temple's religious exercise, because without water and sewer- Substantial burdens only- substantial burdens only matter for land-use regulations. My point would be, that's not a land-use regulation, that's a government service denial. I'm denying you service. You can use your land however you choose, I'm just not sending you sewer. Well, Your Honor, if the- if the- the county's unwillingness to provide sewer meant that the property owner couldn't build a structure of the size that would alleviate a substantial burden in this case, then it would be a land-use regulation under RLUIPA. So, Your Honor, the way- in any event, the way that the plan is- is constructed, it is part of a larger system of land-use regulations in Prince George's County. It's the core function of the development process in the county to get a water-sewer upgrade from Category 5 to Category 4, then proceed into the development review process at which all of the things that the county purportedly was concerned about in this case, specifically traffic impacts and road safety, can be addressed. Judge Thacker asked why the county hadn't- or whether the county had previously gotten a traffic study in this case, in this area. In fact, if the county had done what least restrictive means require it to do and advanced the property to Category 4, that's when a traffic study would, in the ordinary course, be performed. That's when the county's experts, subject matter experts, the MNCPPC, could weigh in and ask the county to- pardon me, ask Victory Temple to undertake traffic studies, archaeological studies, grading studies, assess stormwater management, all the things that typically occur in a development process. The county didn't let Victory Temple get to that stage because by keeping the property in Category 5, Victory Temple couldn't move forward. I want to just- Were you one of the lawyers at the trial? Yes, Your Honor. Was there a discussion of why no expert witnesses were offered or testified? The county didn't- my recollection, Your Honor, is that the county didn't put forward an expert at trial and didn't explain why it hadn't had one. Of course, the county said in its brief, it's because of COVID, that it wasn't possible to get a traffic study or a traffic study wouldn't have been helpful. But I think even more importantly, Your Honor, there was no traffic study done during the administrative process. So the county didn't have that evidence available to it when it was making a decision purportedly based on traffic safety. The only evidence the county had before it during the administrative process when it was considering Victory Temple's application was the anecdotal commentary and observations of neighbors who lived in the area. The photos that Mr. Wray mentioned, as he acknowledged, were not put forward before the county council. The evidence that- other evidence they put forward in this record of police- compilations of police reports. Also, those were created post hoc for purposes of trial and were not put forward before the county council. So, to the extent that an expert study even would have been admissible before Judge Chazenow because it wasn't admitted before the county council, certainly the county council didn't have that information available to it. Your Honor- Did they try to reopen the case or anything after the judge ruled to get in more traffic expert witnesses or anything? No, they did not, Your Honor. They did not. Your Honor, I'd like to talk about what evidence is in the record that shows that the county's decision was not based on traffic in this case, was based on something other than traffic. You know, I- and before I do, I'd just like to point out what the standard is here. Strict scrutiny is an exacting standard. As the 10th Circuit put forward in Yellow Bear versus Lampert, which is at 741 F. 348 cited in our brief, RLUIPA's compelling interest test is a strict one. Congress borrowed its language from First Amendment cases, applying perhaps the strictest form of judicial scrutiny owed to American law. That test isn't traditionally the sort of thing that can be satisfied by the government's fair say-so. So, in this case, what is the evidence that the county's- that the county employed the least restrictive means of furthering a compelling government interest? It can't be a broad general interest. It must be specific. And that's the test that Judge Gorsuch articulates in his concurrence in Mass versus Fillmore County. The question is not whether the county has a compelling interest in traffic safety generally, but whether it has such an interest in denying Victory Temple's water sewer category reclassification specifically. And as I mentioned earlier, the record is replete with evidence that something other than traffic safety motivated the county's decision in this case. Beginning with Chair Turner's remarks at the April 23rd hearing, he articulated a series of what he called compelling reasons, which this can be found at page 743 of the joint appendix, and I quote, he said, are including but not limited to traffic impacts, the environmental impacts, the economic impacts, the fiscal impact, potential pollution and air pollution, lack of infrastructure, including for stormwater management, potential impact on the quality of life, inconsistency with the general and area master plans, no demonstration of a hardship by this applicant, and additionally, the city of Bowie's position. In addition, this court can look at the comments and opposition made against the church by community members at the April 16th committee hearing, sorry, the April 16th county council hearing. Those speakers were not, as the county has asserted, united in a concern about traffic safety. In fact, their comments were wide ranging, including concerns about potential light pollution, exhaust from parishioners' cars, and most notably, a potential decline in property value. That came up quite a lot during the April 16th hearing. And there's also evidence in this record that earlier in the application process, before negative comments were made about the church, county stakeholders had no concerns. Why did they think that the addition of a church would cause a decline in their property values? What was their purported reason for that? Your Honor, I can only surmise from their comments, but based on the comments at that hearing and the comments in the no megachurch petition, which is in the administrative record and was before the county council, they argued that megachurches were, and I quote, hulking parasitic entities or tax evaders or bloated castles. And so I can only surmise, but I have the sense that the neighboring community members had nice homes and single family lots and believed that the addition of a church of this size would detract from their property values. But to Your Honor's point, there was no evidence of that. It wasn't as though a property assessor came in and made a testimony about that. These were just the speculations of neighbors. Your Honor, as I was saying- Wouldn't that be characterized as lay evidence? I don't even know if it qualifies as lay evidence, Your Honor. I think it's more akin to speculation. Again, the county itself had no concerns about traffic before these, frankly, before these disgruntled community members spoke at the hearing. When the representatives of Victory Temple met with Chair Turner himself in February 2019, they showed him a conceptual site plan of the 60,000 square foot, two-story church. Excuse me. And according to testimony of Art Horn, an attorney for Victory Temple who was present at that meeting, Chair Turner was fine with the proposal and had no issues with it. The MNCPPC also met with representatives of Victory Temple before Victory Temple submitted its application. And minutes from that meeting, which are pages 1691 to 92 of the joint appendix, reflect their thought that the transportation section doesn't believe there are any significant traffic concerns because the intersection was recently improved. That's subject matter experts from the Maryland National Capital Park and Planning Commission. Also- Now, what was the date of that opinion in relation to all this? So those minutes, that meeting was conducted- I'm talking about, you read something about no traffic concerns. Yes, yes, Your Honor. That meeting was held, I believe, May 18th, 2018. But it can be, the notes can be found at 1691 to 92 of the joint appendix. Now, you agree, you would agree that traffic concerns are legitimate concerns for something like this? I agree that traffic concerns could be legitimate concerns, that there's a world in which they could satisfy strict scrutiny, but the county hasn't mounted evidence to meet its burden in this case. I understand, but the traffic concerns could be the basis for something. I mean, they got to be safe, right? The intersection's got to be safe. It's got to be safe for- Your Honor, certainly, Your Honor. Judge Chazanow concluded without deciding- It's got to be safe for people to stop and search and leave. Your Honor, Judge Chazanow, if I understood you correctly, Judge Chazanow concluded without deciding that traffic safety likely would constitute a compelling government interest, and although we cite cases in our brief that have concluded the opposite. But again, whether traffic safety is an interest as a general matter is a different question than whether it could be specifically a compelling government interest sufficient to- I understand, but you all are not against traffic safety, and neither are we. So we're not going to get hung up on that. No, Your Honor. No, we have no- We agree that traffic safety is important. They didn't prove it here. That's your position. That's correct, Your Honor. Yes, that's correct. That's what Judge Chazanow found, and her findings are reviewed only for clear error. Um, Your Honor, the- I'll just want to add, Your Honor, that this whole litany of excuses that Victory Temple- that are in this record- the record of testimony and exhibits containing negative statements about Victory Temple have been winnowed down by the county to just the one excuse that they think the court will believe, traffic safety. But the county's shifting justifications for its denial decision smacks of pretext and undermines its argument that traffic safety constitutes a compelling government interest in this case. Your Honors, I see that my time has expired. Um, we certainly, uh, request that you affirm the order of the district court entering a permanent injunction against the county in this case. And unless, Your Honors, there are any other questions, we'll rest on our briefs. Thank you, Ms. Casey. Thank you, Your Honor. Mr. Wray? Mr. Wray, you reserve some time. I'd like to address the- the- the last point that my colleague stated, that these reasons smack of pretext. In essence, what is being argued here is that there was a discriminatory intent, or animus, or- against this church by the county council that drove this decision. A few important points here. Number one, the only claim that was brought in this case was pursuant to subsection A of RLUIPA. That is the substantial burden test. Subsection B of RLUIPA addresses discriminatory animus, intent, and pretext. No claim was brought under that. Number two- Your point is- is the fact that you showed animus to the church doesn't matter here. No. My point is there was no animus shown by the county council to the church. And that comes to my second point. The- the county- what- the overwhelming evidence that has been suggested here was a petition that was part of the record, never addressed by the county council, never discussed or analyzed by the county council. Not a single county council member addressed anything concerning a megachurch. The county council's decision was based on the traffic concerns as well as other reasons. Whether or not we winnowed down to what we considered the most compelling reason or not is not the point. The overwhelming testimony, if you read it, from the record before the county council, concerned traffic. Not property values. It was made an illusory comment to. And yes, it's speculation on both sides. But traffic. Traffic accidents. Property. And these are traffic accidents right next to this property. Not in the broad county. So that record is- And are you saying that the reason the county didn't do a traffic study to submit into evidence to support their- their overwhelming issue was because of the pandemic? We couldn't do a traffic study. And I can't get into the issues outside the- the- the record, Your Honor. But that was one of the most significant reasons. A traffic study requires traffic. Ordinary course traffic. All schools were closed. And yet, but I think- I thought that in your opening portion, you said that the county consented to the expedited trial. It did. That's correct. Then- then it's sort of a problem created in your own- by your consent to the expedited trial. Yes and no, Your Honor. I mean, no one in this circumstance then could predict this pandemic or the effects it would have. Before discovery even began, before this example stepped off the platform at the training station, we consented to that- to plaintiff's request for an expedited trial. So I think that you're right. We did consent. And ultimately, that was an issue. But I don't think that can be equated to the- the- all of the ramifications of this global pandemic that affected this trial and knowing those at the outset. The last thing I would like to address with my remaining moments is the idea that it wasn't until the community testified at the county's public hearing that all of a sudden it became traffic. That is inaccurate. There was an earlier public hearing before Bowie, and it is in the record, and Bowie's recommendation, which is specific about the improvements needed to the road, the traffic issues this development represents, and not just those issues, is in that document, which is in this record. Moreover, the Transportation and Infrastructure Committee met on these very issues and recommended to deny the application. The final thing I would like to say is while there is not a traffic study in this record, it was not discussed at trial. It was not brought up one way or the other at trial, and there is no requirement in the current sewer plan or under the law concerning these types of issues that a traffic impact study or expert testimony be required for this. I thank you, your honors. I ask you to reverse the decision below. If there are no other questions. Thank you very much, Mr. Ray. The case will be submitted.
judges: Robert B. King, Stephanie D. Thacker, Julius N. Richardson